# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>CHENYAN WU (1),<br>LIANCHUN CHEN (2),<br><br>Defendants. | Case No. _____'21 MJ4627_____<br><br>COMPLAINT FOR VIOLATION OF:<br><br>Title 18, U.S.C., Sec. 1001 – False<br>Statements; Sec. 545 - Smuggling Goods |

The undersigned complainant, being duly sworn, states:

### Count 1
### (False Statement (CHEN))

On or about April 20, 2021, in the Southern District of California, defendant LIANCHUN CHEN (2), in a matter within the jurisdiction of the United States, namely, the Federal Bureau of Investigation (FBI), a department and agency of the United States, did knowingly and willfully make false, fictitious and fraudulent statements and representations as to material facts in that she did represent and state to an FBI Agent that she had not provided Company A's Confidential Information to defendant CHENYAN WU (1), whereas in truth and fact as defendant LIANCHUN CHEN (2) then and there well knew, that statement and representation was false, fictitious and fraudulent when made; in violation of Title 18, United States Code, Section 1001.

//

//

//

Complaint – *U.S. v. WU et al.*

Count 2
(Smuggling Goods (WU))

On or about May 8, 2021, within the Southern District of California and elsewhere, defendant CHENYAN WU (1) did knowingly and willfully, with the intent to defraud the United States, smuggle and clandestinely introduce, and attempt to smuggle and clandestinely introduce into the United States, merchandise, which should have been invoiced, to wit: imidazole, nickel sulfate, ethidium bromide, ammonium persulfate and chloroform; all in violation of Title 18, United States Code, Section 545.

And the complainant states that this complaint is based on the attached statement of facts, which is incorporated herein by reference.

Scott Szalay, Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me
This          day of December, 2021.

**Dec 8, 2021**

Hon. Andrew G. Schopler
United States Magistrate Judge

2

Complaint – *U.S. v. WU et al.*

**AFFIDAVIT IN SUPPORT OF COMPLAINT AND ARREST WARRANT**

I, Scott Szalay, declare under penalty of perjury that the following statement is true and correct:

1.       I am a Special Agent with the Federal Bureau of Investigation (FBI). After completing the 16-week training at the FBI Academy in Quantico, Virginia, I joined the San Diego Division in December 2015. I spent approximately two years on the Organized Crime Drug Enforcement Task Force San Diego Strike Force investigating Mexican criminal organizations along the southwest border. Since September 2017, I have been assigned to the Counter-Intelligence squad, investigating theft of trade secrets, espionage, illicit proliferation of sensitive technology, and unlawful retention or disclosure of sensitive and classified government information. Through my training and experience, as well as through discussions with other law enforcement agents, I have become familiar with the illicit proliferation of sensitive technology, related laws, and the interpretation and application of federal laws. In this capacity, I have executed multiple arrest and search warrants.

2.       The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation (including other law enforcement officers), my review of documents and computer records related to this investigation, and information gained through my training and experience. This affidavit does not set forth every fact that I or others have learned during this investigation.

3.       I make this affidavit in support of the issuance of a criminal complaint and arrest warrant against Chenyan WU and Lianchun CHEN.

3

4.       As set forth more fully herein, there is probable cause to believe that Chenyan WU and Lianchun CHEN committed violations of Title 18, U.S.C., Section 1001 (False Statements) (CHEN); and Title 18, U.S.C., Section 545 (Smuggling Goods in the United States) (WU). In summary, CHEN was providing her husband, WU, with confidential Company A information to further WU's research at his laboratory in China. On May 8, 2021, WU tried to move his laboratory back to the United States, without declaring any of it to Customs and Border Protection Officers.

## Background

mRNA research at TheraMab

5.       In December of 2019, the FBI found a Powerpoint presentation on the cell phone of a Chinese Defendant, who had previously pled guilty to export control violations. The presentation was in Mandarin. Once translated, the cover page of the packet read: "TheraMab's mRNA Cancer Vaccine Project," presented by Chenyan WU. The presentation outlined TheraMab's company structure and investment plan and summarized its mRNA research process.

6.       According to the California Secretary of State, TheraMab, Inc. was a laboratory registered in California on September 24, 2012. The listed agent was Chenyan WU with a registered address of 8923 Polanco St, San Diego, California, 92129. According to state records, TheraMab was dissolved on June 20, 2016. Despite being registered in California, it appears that TheraMab was actually running out of Taicang, China.

7.       WU is married to Lianchun CHEN. WU and CHEN are both scientists. WU was employed by Company A in the United Kingdom from 1999 through 2010. WU moved to China in 2010, where he worked for a

4

different biopharmaceutical company through 2012. In 2012, WU started TheraMab Laboratory in China.

8. Company A confirmed that WU was a Company A employee in the United Kingdom from 1999 to 2010, and that WU did not work on mRNA research at Company A. Company A confirmed that CHEN was employed at Company A from 2011 through September 9, 2021, and conducted mRNA cancer vaccine research.

9. The FBI provided Company A with a summary of the TheraMab presentation found on the phone.  Representatives of Company A reviewed the presentation and informed the FBI that the mRNA presentation mirrored some of the work that CHEN had been doing for Company A.

10. Company A informed the FBI that CHEN was very involved in the mRNA cancer research at Company A. She participated in project meetings and research, specifically developing DNA vectors, for approximately the past four years as part of her role as a bench scientist for a team that was in the process of performing early-stage mRNA cancer vaccine research.

11. Company A confirmed that the mRNA cancer research CHEN worked on was considered proprietary research. Access to Company A was restricted to company employees (through badges and security), and access to the laboratory where CHEN worked was specifically restricted to Company A employees working on the specific mRNA project. Similarly, access to Company A electronic records was restricted by badge and password, and Company A created a shared file storage on the Company A network with access restricted solely to Company A employees working on the specific mRNA project. Company A employees, including CHEN, received annual training on the importance of confidentiality in their research. Nonetheless, CHEN could have downloaded Company A confidential information onto

a thumb drive, printed out copies or taken pictures of it with her phone, and removed it from the premises.

CHEN Provided WU With Company A Documents Marked "CONFIDENTIAL"

12.     The FBI searched WU's email account pursuant to a search warrant and identified multiple emails from CHEN to WU over a period of approximately five years, which included documents marked CONFIDENTIAL by Company A. Some of the relevant email exchanges are listed below:

a.  On November 7, 2013, WU, using his Hotmail account, sent an email to CHEN at her Hotmail account. The subject of the email was "sequences" and the text of the email was "I need new vector sequences and sequence to be cloned." On November 12, 2013, CHEN, who was working at Company A at the time, responded to WU's email, changed the subject of the email to "RE: My sequences," and added a Word document, which included DNA sequence data consistent with the research that CHEN had been working on for Company A at the time.

b.  On May 12, 2018, WU forwarded an email he received in his Hotmail account from CHEN to WU's TheraMab email account. The email did not contain text in the body of the email but included a PowerPoint attachment and a Word document. The PowerPoint was titled "PCR Results with second extracted DNA" and was labeled from Company A Vaccine Research & Development and marked "[Company A] CONFIDENTIAL[.]" The Word document was titled "Work Weekly Update May 7-13" and was an update of CHEN's work for Company A for the past week and the work CHEN planned to achieve the following week.

6

c.   On May 27, 2018, WU forwarded an email he received in his Hotmail account from CHEN's Hotmail account to his TheraMab email account. The email did not contain text in the body of the email but included a PowerPoint attachment and a Word document. The PowerPoint was titled "PCR Results with Q5 andPfx" and was labeled from Company A Vaccine Research & Development and was marked "[Company A] CONFIDENTIAL[.]" The Word document was titled "Work Weekly Update May 21-27" and was an update of CHEN's work for Company A for the past week and the work CHEN planned to achieve the following week.

d.   On June 21, 2018, WU forwarded an email he received in his Hotmail account from CHEN's Hotmail account to his TheraMab email account. The email did not contain text in the body of the email, but included a PowerPoint attachment. The PowerPoint document was titled "Identity Test for WO-12, WP4, WP7, WP8 and WP9[,]" labeled from Company A Vaccine Research & Development and marked "[Company A] CONFIDENTIAL."

13.   Company A is investigating whether the attachments to these emails would qualify as trade secrets. A Company A representative did note that the work that CHEN and her group were conducting at Company A would be extremely useful to WU's TheraMab's project of developing a generic mRNA vaccine.

## False Statement

Interview of CHEN

14.   On April 20, 2021, FBI agents interviewed CHEN at her home in San Diego. She agreed to speak with the agents. During the course of the

7

interview, Agents told CHEN that lying to a federal officer could be prosecuted as a criminal felony.

15.    CHEN said that she worked for Company A as a research scientist focusing on cancer vaccine research. She conceded that as part of her employment, she received regular training on intellectual property and trade secret protections.

16.    CHEN said that her husband, WU, had been living in China for approximately the last 10 years, and came back to the United States intermittently during that time. He was moving back to the United States permanently in May 2021. CHEN said that WU's company, TheraMab, was a pharmaceutical/biotech company that produced antibody protein research. CHEN said that WU shut down TheraMab at the end of 2020. She did not mention that WU planned to reopen that lab in the United States.

17.    Agents showed CHEN the TheraMab mRNA PowerPoint presentation. She said that she was not the author of that presentation, nor did she understand the topic of mRNA. *CHEN stated that mRNA was not her field of study or expertise and maintained that she had not shared any Company A confidential information or trade secrets with WU.* CHEN denied doing work for TheraMab or for WU. CHEN explained that she and WU worked in similar fields, but he had a better background in mRNA and could understand the material better than she could.

18.    CHEN also noted that when she first started working at Company A in approximately 2011, WU may have confirmed that some of CHEN's maps, which she was working on as part of her job at Company A, were correct. She conceded that she may have emailed them to WU. CHEN stated that

8

by the time of the interview in April 2021, she no longer worked on maps as part of her job at Company A.

19.   CHEN noted information about mRNA was available in published papers. She conceded that her group at Company A was working on an mRNA project but minimized her role. She said she only worked on a small part of the project and did not conduct any research or analysis. She maintained that she solely worked on the DNA/molecular structure part, which was at the very beginning. Once she did her part, the research was passed on for others to work on the next step. She did not review the results of the program trials and was not part of developing any research. She maintained that she had not disclosed any of that research to WU.

## Smuggling Goods Into the United States

WU Imports Hazardous Materials into the U.S.

20.   On May 8, 2021, Chenyan WU arrived at Seattle-Tacoma International Airport on Delta Flight 288 from Shanghai, China. WU's final destination was San Diego, California.  Upon entry into the United States, WU filled out a Customs and Border Protection (CBP) Form 6059-B, Declaration Form. On the Form 6059-B, WU affirmed he was not brining any disease agents, cell cultures or commercial merchandise (articles for sale, samples used for soliciting orders or goods that are not considered personal effects) into the United States.

21.   WU did not orally declare any biological, chemical items or commercial merchandise to CBP officers at Customs.

22.   However, while inspecting WU's suitcases, CBP officers discovered multiple research samples, chemical samples, medical/biological equipment that were undeclared and improperly packaged. CBP detained the items. Initial inspection revealed about 700 to 1,000 unlabeled

9

centrifuge tubes, which appeared to contain proteins, and multiple containers of lab chemicals. Labeled samples appeared to include potentially hazardous materials.

23.    That same day, the FBI interviewed WU at the Seattle-Tacoma International Airport. WU stated he had been running TheraMab, a cancer research company, in China for the past ten years. WU closed down his lab in China and was returning to San Diego to continue his cancer research in a new lab he would start up in San Diego. WU was bringing his lab equipment, including reagent chemicals, in five checked suitcases from China to set up his new lab in San Diego.

24.    FBI Seattle's Hazardous Evidence Response Team (HERT) deployed to Seattle Tacoma International Airport to assist CBP inventory the items, field screen them for biological and chemical materials, and collect them as evidence. CBP transferred custody of the items to the Seattle HERT, which then repackaged the items safely and submitted them to the National Bio-forensic Analysis Center (NBFAC) for further analysis.

25.    In a June 25, 2021 report, the FBI Laboratory Division Scientific Response and Analysis Unit reviewed the labels or Chemical Abstracts Registry Number of the chemicals WU was bringing into the United States and identified imidazole,[1] nickel sulfate,[2] ethidium bromide,[3] ammonium

---

[1] Imidazole is a common laboratory chemical with many uses including chemical synthesis and the preparation of pH buffer solutions in the range of pH 6.2-7.8.

[2] Nickel sulfate is used in nickel-plating iron and copper, as a catalyst, as a mordant (dye fixative) in the textile industry, and as a coating for other substances.

[3] Ethidium bromide (EtBr) or 3,8-Diamino-5-ethyl-6-phenylphenanthridinium is commonly used as a non-radioactive marker to stain DNA for electrophoresis. EtBr is a dark red, crystalline, non-volatile, odorless powder that is moderately soluble in water. EtBr is a potent mutagen (can cause genetic damage), and is moderately toxic after an acute exposure.

persulfate[4] and chloroform[5] that met the definition of hazardous materials as defined in USDOT regulations and should have been declared.

26. The bottle of ethidium bromide had a warning label noting the chemical was "Harmful if swallowed" and "Fatal if inhaled."

27. A September 21, 2021, report from the FBI laboratory Chemistry Unit reported that the chemicals WU attempted to import into the United States that should have been declared included 587.5 grams of imidazole, 282.9 grams of nickel sulfate, 4.6443 grams of ethidium bromides, 39.9471 grams of ammonium persulfate and 18.2755 grams of chloroform.

WU Knew How to Properly Ship Chemicals and Biological Materials

28. A review of the returns from WU's Hotmail account included the following email exchange in January 2020 between WU and representatives of another biochemical company:

a. On January 29, 2021, WU sent the representative an email with the Subject: "new study design and mRNA shipping to [Company]." The email contained the following text:

> Hi Y____ and P____, Good morning! Could you let me know your feedback about the new study design? Please let me know the time when we can ship the 1007 modified mRNA, which is ready for shipping. Best, Chenyan

b. On January 30, 2021, one of the representatives replied to WU's email with the following response.

> Hello Chenyan: thanks for your updates to the workplan. We have had internal discussions around the issue of shipping our material. While we can appreciate that the costs of shipping are

---

[4] Ammonium persulfate is widely used in biological research for the preparation of polyacrylamide (electrophoresis) gels.
[5] Chloroform is a colorless, volatile, chlorinated organic solvent whose vapors have a narcotic effect. Chloroform is a common solvent for both chemistry and biological research.

high, [Company] is not comfortable with the approach of having the materials shipped to a CRO in San Diego and then having them transported by you back to China. As you know, dry ice is identified as a hazardous material and should only be used to transport material by a person or organization with a license to do so. We are concerned about potential liability as well as the material being compromised in transit. Therefore, we can only agree to ship the materials directly to China as we did previously. If you have a shipper who is more cost effective, we would be happy to use them. If you are open to this, we will move forward with processing the TEA and providing feedback to the workplan. Best Regards, Y\_\_\_\_

29. This email exchange highlights that WU had dealt with transporting hazardous material prior to May 2021 and knew that only individuals or organizations with licenses were authorized to do so.

Interview of WU (May 8, 2021)

30. On May 8, 2021, the FBI provided the *Miranda* warnings and then interviewed WU at the Seattle-Tacoma Airport. He agreed to speak with the agents.

31. WU told the agents that he started TheraMab in 2012. In 2017, WU read a publicly available paper on mRNA, noted it was an emerging field, and began focusing on a generic mRNA cancer project. In 2017, WU transitioned TheraMab to focus solely on developing an mRNA vaccine. WU developed the project from the information in open source papers on mRNA, combined with his expertise in cancer work from his previous employment at the biotechnology company where he worked from 2010 to 2012.

32. WU stated he was the only researcher for TheraMab. According to WU, CHEN did not have the skills or training to work on TheraMab's mRNA project. WU further distinguished his mRNA project from Company A's,

stating that TheraMab was developing a generic vaccine, while Company A's mRNA projects focused on a specific type of cancer. WU maintained that CHEN did not conduct any work for TheraMab, nor did she share any information with him about Company A's mRNA research.

Interview of WU (May 18, 2021)

33. Ten days later, on May 18, 2021, the FBI spoke to WU again. This time the interview occurred at his home in San Diego.

34. On May 18, 2021, the FBI showed WU a copy of the CBP Form 6059-B Declaration Form that he had filled out, where he had noted that he had nothing to declare. WU acknowledged that he understood the importance of those forms; he knew he needed to fill out the forms accurately; and he acknowledged that he knew there were certain ways to ship chemicals internationally.

35. WU stated that China had extremely strict rules and paperwork to ship reagents to the United States and that was why he wanted to "take a gamble to be honest" when he brought chemicals and biological materials illegally into the United States in his luggage. WU noted that he was attempting to obtain additional funding in China to continue his research there as late as February 2021. If he had obtained the additional funding, he would have kept his lab in China. Given the short timeline between February 2021 and his planned return to the United States in early May 2021, it would have been difficult to follow the official procedure to transport his laboratory items from China to the United States legally.

36. WU acknowledged that he did not follow the process to bring chemicals into the United States and did not declare the items he had in his suitcase, even though he knew of the process to get chemicals into the United States

13

legally. WU said he knew he "made a mistake already." WU asserted that there were no dangerous or hazardous materials in his luggage.

Interview of WU (June 30, 2021)

37.   On June 30, 2021, after receiving results from the FBI laboratory, FBI Agents conducted a third interview of WU at his residence in San Diego. Agents asked why WU previously stated there were no dangerous chemicals in his luggage and showed WU photographs of some of the chemicals in his luggage. WU explained that he did not consider the chemicals to be dangerous to him, because he uses them all the time. Later, WU stated that he had forgotten everything that was in his luggage and now realized some of items would be considered hazardous or dangerous.

CHEN's WeChat Messages Confirm Her Knowledge of, and Involvement in, TheraMab

38.   CHEN received a voice message from an unknown WeChat profile on December 28, 2019, congratulating CHEN on developing a new medicine with WU after CHEN had sent a message asking the unknown person for funding.

39.   A translation of the WeChat voice messages are as follows:

- CHEN text message: Do you have friends who are interested in investing drug production? My husband is looking for investors. He has designed a medicine that uses RNA method to treat cancer. Animal test result is pretty good. More money is needed to move forward. Contact me if you want to know more.

- Unknown male voice message: I will go there to visit a friend. Congratulations to you and elder brother for finding a new drug. You can send me some information and I will check if anyone is interested in this product when I am there. I'll fly to Los Angeles from London on the 10th. And on the 12th.

14

- CHEN voice message: My husband will attend a meeting in San Francisco on the 11th and flies back to San Diego that night. Do you have time to visit San Diego? I will tell him to contact you or I can arrange you two in a WeChat.

15